ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2023-Jan-05  15:14:16
60CV-23-162
C06D17 : 24 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**ALWILDA INGLE, Individually and as**                    **PLAINTIFF**
**Personal Representative on behalf of the**
**Estate of Ernest Dale Ingle**

**vs.**

**JOHNSON & JOHNSON and**
**ETHICON, INC.**                                              **DEFENDANTS**

### COMPLAINT AND JURY DEMAND

Plaintiff Alwilda "Ray" Ingle, Individually and as personal representative of the Estate of

Ernest Dale Ingle (hereinafter referred to as "Plaintiff"), by and through their counsel, hereby

brings this civil action as a related action against JOHNSON & JOHNSON ("J&J"), a New Jersey

corporation; and ETHICON, INC. ("Ethicon"), a New Jersey corporation (collectively

"Defendants").

### NATURE OF THE CASE

1.      This is an action for wrongful death, products liability, failure to warn, and

defective design, brought by Plaintiff Alwilda "Ray" Ingle ("Plaintiff"), individually and on behalf

of the Estate of Ernest Dale Ingle ("Decedent"), for injuries arising out of the Ethicon Physiomesh

mesh ("Physiomesh" or "Ethicon Multi-Layered Hernia Mesh").

2.      Defendants J&J and Ethicon designed, manufactured, and supplied to doctors

multi-layered hernia mesh, including the Ethicon Multi-Layered Hernia Mesh.

3.      Ethicon Multi-Layered Hernia Mesh created an unreasonable risk of harm to

Decedent Ernest Dale Ingle.

Date served: 4 /26/2023  Product(s): Physiomesh
Company(s) served: JJ
Method served: HS  FX (CM) RM  OTHER _____
Date received by LD: 5 /3 /2023  No postmark: _____
Service type: (Initial) Add'l  Refiled  Amended  Multi #_____
JJL# 2023000137    Paralegal: MD

1

4.     The unreasonable risk of pain, dense adhesion formation, bowel complications, mesh shrinkage, hernia recurrence, seroma and fistula formation, and infection, whether from a prolonged and pronounced inflammatory response caused by the multiple layers, degradation of polymers due to exposure to gamma irradiation, non-conforming subcomponents, or some other mechanism, renders Ethicon Multi-Layered Hernia Mesh a defective product.

5.     The selection and implantation of the Ethicon Multi-Layered Hernia Mesh by Decedent's surgeons were a result of the misinformation, marketing, sales, promotion, and direction by Defendants.

6.     The Ethicon Multi-Layered Hernia Mesh failed to perform as intended when it was implanted in Decedent Ernest Dale Ingle, and as a result was a direct and proximate cause of Decedent's injuries and subsequent death.

## JURISDICTION AND VENUE

7.     This is a lawsuit over defective hernia mesh designed, marketed, manufactured, promoted, and sold within Arkansas and the United States by Defendant Ethicon and its parent company J&J.

8.     Plaintiff resides in Carlisle, Prairie County, Arkansas and is a citizen and resident of Arkansas. At the time of his death, Decedent Ernest Dale Ingle resided in Cabot, Arkansas and was a citizen of Arkansas. Decedent underwent hernia repair surgery on or about June 14, 2016, at Baptist Health Medical Center-North Little Rock, in Arkansas. At that time, the Physiomesh that Defendants manufactured, distributed, and warranted was implanted into Decedent. Decedent Ernest Dale Ingle's surgeon, medical staff, and other healthcare providers met or exceeded the standard of care applicable to the hernia surgery.

2

9.     Defendant J&J is a corporation incorporated in New Jersey, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

10.    Defendant J&J organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its products, including but not limited to its hernia repair mesh products. Within J&J there are three sectors: medical devices and diagnostics, pharmaceutical, and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." J&J charged the Ethicon Franchise with the design, development, promotion, marketing, testing, training, distribution and sale of the Physiomesh, the hernia repair mesh products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon, Inc.

11.    Defendant Ethicon is a wholly owned subsidiary of Defendant J&J. Defendant Ethicon is a corporation incorporated in the State of New Jersey with its principal place of business in Somerville, New Jersey. Defendants conduct business throughout this State.

12.    Defendant Ethicon is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices including Ethicon Multi-Layered Hernia Mesh.

13.    J&J, directly and/or through the actions of Ethicon, has at all pertinent times been responsible for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of Ethicon Multi-Layered Hernia Mesh.

3

14.     At all relevant times, Defendants either directly, or through their agents, apparent agents, servants or employees sold, distributed and marketed the defective Ethicon Multi-Layered Hernia Mesh in the State of Arkansas. Defendants derive substantial revenue from hernia mesh products used or implanted in the State of Arkansas. As such, Defendants expected or should have expected that their business activities could or would subject them to legal action in the State of Arkansas.

15.     All Defendants were also involved in the business of monitoring and reporting adverse events concerning the Ethicon Multi-Layered Hernia Mesh and having a role in the decision process and response of Defendants, if any, related to these adverse events.

16.     The Ethicon Multi-Layered Hernia Mesh Defendants are subject to jurisdiction within the State of Arkansas and this Court because:

a. Defendants are engaged in substantial and not isolated business activity within the State of Arkansas

b. Defendants' hernia mesh products, including the subject Physiomesh, was designed, manufactured, and placed into the stream of commerce in State of Arkansas by the Defendants.

c. Upon information and belief, at all relevant times, Defendants committed tortious acts within the State of Arkansas out of which these causes of action arise.

17.     At all times relevant hereto, the Defendants developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective Ethicon Multi-Layered Hernia Mesh throughout the United States, including within the State of Arkansas and specifically to Decedent Ernest Dale Ingle's implanting physician or their practice group, or to the hospital where the Ethicon Multi-Layered Hernia Mesh was implanted.

18.     This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and cost.

## PHYSIOMESH HISTORY

19.     Defendants were the designers, manufacturers, distributors and suppliers of the Physiomesh at all material times.

20.     Defendants warranted the Physiomesh and placed the device into the United States stream of commerce.

21.     Physiomesh has a unique multi-layer design incorporating five (5) distinct layers: two layers of poliglecaprone-25 ("Monocryl") film covering two underlying layers of polydioxanone film ("PDS"), which in turn coat a polypropylene mesh. This design is not used in any other hernia repair product sold in the United States.

22.     The multi-layer coating was represented and promoted by the Defendants to prevent or minimize adhesion and inflammation and to facilitate incorporation of the mesh into the body, but it did not. Instead, the multi-layer coating prevented adequate incorporation of the mesh into the body and caused or contributed to an intense inflammatory and chronic foreign body response resulting in an adverse tissue reaction including migration and damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue and improper healing.

23.     When implanted intraperitoneally, which involves the abdomen being inflated and then deflated, and the product being implanted in contact with the intestines and/or other internal organs, the Physiomesh design unnecessarily increases the risk of mesh deformation, adhesion, erosion, fistula formation, and other injuries. When implanted using an open procedure, the Physiomesh design provides no benefit, and instead increases the risks associated with the product.

24.     The multi-layer coating of the Defendants' Physiomesh is not biocompatible, which causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

25.    When affixed to the body's tissue, the impermeable multi-layer coating of the Physiomesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection, abscess formation, and other complications.

26.    The multi-layer coating provides a breeding ground for bacteria in which the bacteria cannon be eliminated by the body's immune response, which allows infection to proliferate.

27.    Defendants knew or should have known of the lack of biocompatibility of the multi-layer coating of the Physiomesh prior to introducing it into the stream of commerce.

28.    The polypropylene material used in the Physiomesh is unreasonably susceptible to in vivo oxidative degradation, which causes or exacerbates excessive inflammation and adverse foreign body reaction, leading to shrinkage, scarification, pain, and mesh deformation.

29.    The polypropylene mesh portion of the Physiomesh lacked sufficient strength to withstand normal abdominal forces, which results in recurrent hernia formation and/or rupture and deformation of the mesh itself.

30.    One of the purported benefits of the Physiomesh design was implantation using laparoscopy, which involves minimally invasive surgery. However, treatment of complications associated with Physiomesh often requires open surgery, thus obviating any purported benefit from the intended laparoscopic implantation technique.

31.    In May 2016, Defendants issued an "Urgent: Field Safety Notice" relating to the Physiomesh, the same product implanted in Plaintiff, and sent such notification to hospitals and medical providers in various countries worldwide. In this Urgent Field Safety Notice, Defendants advise these providers of "a voluntary product recall," citing two international device registries which reported data reflecting recurrence/reoperation rates being higher than that observed form a

6

data set relating to patient outcomes after being implanted with other mesh. Ethicon's "Urgent: Field Safety Notice" stated Ethicon believed the higher rates to be a multifactorial issue, including possible product characteristics. However, in the United States, Defendants failed to issue a nationwide recall, opting instead to simply remove the product form the market and cease further sale within the United States. Ethicon also knew or had reason to know that those implanted with the Physiomesh were still at risk for adverse events since Ethicon stated in the Field Safety Notice that those implanted with Physiomesh should continue to be followed. Despite its knowledge, Ethicon did not issue any warning, caution or instruction to hospitals, physicians or patients regarding the importance of monitoring for potential complications.

### FAILURE TO WARN PHYSICIANS OF THE DANGERS ASSOCIATED WITH ETHICON MULTI-LAYERED HERNIA MESH

32.     Before placing Ethicon Multi-Layered Hernia Mesh on the market, Defendants were required to mitigate risks of the product, including any element of design or sterilization which could render the device ineffective, weaken the structural integrity of the device, or increase or prolong inflammation once the device is implanted, which would result in an increase in adhesion formation, mesh shrinkage, pain, bowel complications, hernia recurrence, and/or the need for early surgical revision in patients-consumers.

33.     Defendants designed, manufactured, and marketed the Ethicon Multi-Layered Hernia Mesh, despite long-standing knowledge that the materials utilized in Ethicon Multi-Layered Hernia Mesh would cause dense adhesions, chronic pain, mesh shrinkage, bowel obstructions, and early hernia recurrence.

7

34.     When the multi-layer coating of Ethicon Multi-Layered Hernia Mesh is disrupted and/or degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, and can become adhered to organs, causing damage to organs and potential fistula formation.

35.     The multi-layer coating of the Ethicon Multi-Layered Hernia Mesh is cytotoxic, immunogenic, and not biocompatible. The coating therefore causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

36.     Defendants knew or should have known of the cytotoxic and immunogenic properties of the multi-layer coating of the Ethicon Multi-Layered Hernia Mesh prior to introducing it into the stream of commerce.

37.     The polypropylene mesh portion of the Ethicon Multi-Layered Hernia Mesh was insufficient to withstand normal abdominal forces, resulting in recurrent hernia formation and/or rupture and deformation of the mesh itself.

38.     Defendants marketed Ethicon Multi-Layered Hernia Mesh to general surgeons, hospitals, and group purchasing organizations (GPOs), rather than end-user patients.

39.     Defendants had the ability to inform surgeons, hospitals, or GPOs of developing problems or defects related to Ethicon Multi-Layered Hernia Mesh in its devices through e-mail, letter, recalls, warnings in product inserts, and/or through its product representatives, who work directly with the surgeon.

40.     The multiple layers of Ethicon Multi-Layered Hernia Mesh increase the intensity and duration of the inflammatory response. That response in turn increases dense adhesion formation from underlying organs to the Ethicon Multi-Layered Hernia Mesh, resulting in bowel

complications, mesh contracture, hernia recurrence, increased foreign body reaction, chronic severe pain, and more.

41.     The Physiomesh IFU has a section for contraindications, which list "None known."

42.     The Physiomesh IFU has a section for adverse reactions, which list "Potential adverse reactions are those typically associated with surgically implantable materials…" The polypropylene base of Ethicon Multi-Layered Hernia Mesh carries many potential adverse reactions, such as a life-long inflammatory response that other surgically implantable materials do not present. Additionally, the multiple layers of Ethicon Multi-Layered Hernia Mesh further increase the inflammatory response and rate of infection, adhesion formation, chronic pain, seroma formation, fistula formation, hematomas, mesh contracture, hernia recurrence, mesh migration, bowel complications, foreign body response, extrusion, and other additional injuries.

43.     Defendants failed to warn that Ethicon Multi-Layered Hernia Mesh creates a solid barrier preventing the body from adequately clearing or transporting fluid, which results in seroma formation, potentiating infections, and fistula formation.

44.     Defendants never performed any clinical trials and/or studies prior to marketing Ethicon Multi-Layered Hernia Mesh.

45.     Defendants did not fully and/or adequately test the configuration of these new, multi-layered barrier hernia meshes, that were implanted into Plaintiff.

46.     Reassurances of device safety were made through direct promotional contact by Defendants' sales representatives and distributors, through word-of-mouth from Defendant's physician/technical consultants, and/or through industry targeted promotional materials.

47.     Despite these reassurances, the defective design and manufacture of Ethicon Multi-Layered Hernia Mesh continued to elicit severe and chronic inflammatory responses, resulting in

adhesion formation, bowel injuries, mesh contracture, pain, hernia recurrence, infections, seromas, fistulas, erosion, extrusion, and additional complications.

48.     Defendants were aware that the Monocryl layer was ineffective at preventing adhesions to the polypropylene; the polypropylene utilized was too weak; the coating on both sides of the mesh would prevent incorporation; the barrier created by the Monocryl layer would prevent fluid clearance; and the multi-layered mesh would contract massively over time. Nonetheless, Defendants employed the design in its Ethicon Multi-Layered Hernia Mesh in a reckless disregard for the safety of patients, including Plaintiff.

49.     From the time that Defendants first began selling Ethicon Multi-Layered Hernia Mesh in the United States through today, product labeling and product information failed to contain adequate information, instructions, and warnings concerning the following: implantation of the mesh, specifically its propensity to massively shrink, the increased duration and intensity of inflammation, and the elevated rate of adhesions, bowel complications, chronic pain, hernia recurrence, seroma formation, hematoma formation, fistula formation, erosion, extrusion, infection, and other injuries that occur at a higher rate than other surgically implanted devices.

50.     Defendants J&J and Ethicon were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution, and sale of Ethicon Multi-Layered Hernia Mesh, including providing the warnings and instructions concerning the hernia mesh product.

51.     Among the intended purposes for which Defendants J&J and Ethicon designed, manufactured, and sold Physiomesh was use by surgeons for hernia repair surgeries. That was the purpose for which the Physiomesh was implanted in Decedent Ernest Dale Ingle.

10

52.     Defendants represented to Decedent and their physicians that their Physiomesh was a safe and effective product for hernia repair.

53.     Defendants' Physiomesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of the Physiomesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components, including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; inadequate or failure of incorporation/ingrowth; migration; scarification; deformation of mesh; improper wound healing; excessive and chronic inflammation; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

## THE FDA'S 510(k) CLEARANCE PROCESS

54.     The 510(k) clearance process refers to Section 510(k) of the Medical Device Amendments of 1976 MDA of the Federal Food, Drug and Cosmetic Act. Under this process, device manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA approved for sale prior to 1976, when the MDA was enacted.

55.     No clinical testing is required under this process.

56.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k) cleared devices.

57.     Through this domino effect, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by the FDA prior to 1976 could be sold to patients in a matter of 90 days without any clinical testing.

11

58.     Clearance for sale under the 510(k) process does not equate to FDA approval of the cleared device.

59.     In 2012, at the request of the FDA, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, coming to the following major conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.**

60.     The NIH explained, "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medical devices . . . Thus is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

61.     On June 18, 2002, the Food and Drug Administration issued a document titled "Guidance for Resorbable Adhesion Barrier Devices for Use in abdominal and/or Pelvic Surgery; Guidance for Industry." The 26-page document starts by explaining:

> **FDA has determined that the resorbable adhesion barrier is a significant risk device as defined in 21 CFR 812.3(m)(4). The resorbable adhesion barrier is a class III device which is subject to <u>premarket approval</u> in accordance with section 515 of the Federal Food, Drug, and Cosmetics (FD&C) Act.**

12

62.     The Physiomesh did not undergo premarket approval, but instead received 510(k) clearance on or about April 9, 2010. The Proceed was listed as a predicate device on the Physiomesh 510(k) application. Defendants did not claim that the Physiomesh was a resorbable adhesions barrier in their 510(k) application. However, after 510(k) clearance, Defendants marketed the Physiomesh as a resorbable adhesion barrier.

## USE OF THE PRODUCT

63.     A defectively designed, manufactured, and marketed Physiomesh left the hands of Defendants in its defective condition, delivered into the stream of commerce. Dr. John Deloach, M.D. implanted the Physiomesh in Decedent's abdomen to repair an incarcerated incisional hernia on or about June 14, 2016, at Baptist Health Medical Center-North Little Rock, in Arkansas. Decedent was implanted with a 15x20 Physiomesh (Cat # OPHY1525) and a 10x10 Physiomesh, (Cat # OPHY1010).

64.     As a direct and proximate result of Defendants' defective design, manufacture, marketing, distribution, and/or sale of Ethicon Multi-Layered Hernia Mesh and placing the defective products into the stream of commerce, Decedent Ernest Ingle has been injured and damaged as follows:

     a.     On or about January 7, 2020, Decedent had to undergo a small bowel resection after areas of his small bowel were damaged when his surgeon removed those areas of small bowel that had become "plastered" to the underside of the Physiomesh product. This surgery was performed by Dr. John Deloach at Baptist Health-Fort Smith, in Arkansas. Upon visualizing the Ethicon Physiomesh, "Adhesions were extensive with lots of small bowel plastered to the underside of the previously placed mesh.

      b.     Decedent became infected from this surgery and, among other things, developed an enterocutaneous fistula. He required several additional surgeries to repair a small bowel perforation and the fistula. These operations required additional small bowel resection.

      c.     Decedent continued to suffer complications as a result of his implantation with the Ethicon Physiomesh until his death on April 8, 2020.

      d.     Upon information and belief, complications resulting from Decedent's January 7, 2020 surgery caused his death.

65.     The manufacturing and design defects associated with the Physiomesh were directly and proximately related to the injuries suffered by Plaintiff.

66.     Neither Decedent nor their implanting physician were adequately warned or informed by J&J or Ethicon of the defective and dangerous nature of Physiomesh. Moreover, neither Decedent nor their implanting physician was adequately warned or informed by J&J or Ethicon of the risks associated with the Physiomesh or the frequency, severity, or duration of such risks.

67.     The Physiomesh implanted in Decedent failed to reasonably perform as intended. The mesh caused serious injury and necessitated additional invasive surgery.

68.     Decedent's severe adverse reaction directly and proximately resulted from the defective and dangerous condition of the product and defective and inadequate warnings by Defendants J&J and Ethicon about the risks associated with the product, and the frequency, severity and duration of such risks. Decedent Ernest Dale Ingle has suffered both physical injury and pain and mental anguish, permanent and severe scarring and disfigurement, death, lost wages and earning capacity, and has incurred substantial medical bills and other expenses, resulting from

14

the defective and dangerous condition of the product and from Defendants' defective and inadequate warnings about the risks associated with the product.

## CAUSES OF ACTION

### COUNT I:
### STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN
### (Ark. Code Ann. § 16-116-201, et seq.)

69.     Plaintiff incorporates by reference the allegations in all prior paragraphs and further alleges as follows:

70.     At the time the Physiomesh was implanted in Decedent, the mesh product was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Further, Defendants J&J and Ethicon failed to design against such dangers and failed to provide adequate warnings and instructions concerning these risks.

71.     Defendants expected and intended the Physiomesh product to reach users such as Decedent in the condition in which the product was sold.

72.     The implantation of Physiomesh in Decedent was medically reasonable and was a type of use that Defendants J&J and Ethicon intended and foresaw when they designed, manufactured and sold the product.

73.     The risks of the Physiomesh design significantly outweigh any benefits that Defendants contend could be associated with the design. The multi-layer coating, which is not used in any other hernia mesh product sold in the United States, prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. Additionally, the impermeable multi-layer coating of the Physiomesh leads

15

to seroma formation, provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response.

74.     The multi-layer coating of the Physiomesh, which was marketed, promoted and intended as a barrier against adhesion to the internal organs, was only temporary; it was expected and intended to degrade over time inside the body. Thus, the coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh exposed to the internal viscera and tissues. The degradation of the multi-layer coating caused or exacerbated an intense inflammatory and foreign body reaction. Once exposed to the viscera, the polypropylene mesh will inevitably adhere to the viscera, initiating a cascade of adverse consequences. Any purported beneficial purpose of the multi-layer coating (to prevent adhesion to the internal viscera and organs) was non-existent. The product provided no benefit, while substantially increasing the risks to the patient.

75.     The polypropylene mesh within the defective multi-layer coating of the Physiomesh was itself dangerous and defective, particularly when used in the manner intended by Defendants in the Physiomesh. When implanted adjacent to the intestines and other internal organs—as Defendants intended for Physiomesh—polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

76.     The polypropylene mesh used in the Physiomesh device was insufficient in strength to withstand the internal forces of the abdomen after implantation, which made the device susceptible to rupture and/or deformation. That occurred with the Physiomesh implanted in Decedent.

77.     The appropriate treatment for complications associated with Physiomesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient. Decedent underwent additional invasive surgery.

78.     Physiomesh was designed and intended for intraperitoneal implantation, which involved the product being implanted in contact with the intestines and/or other internal organs. The contact unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

79.     At the time the Physiomesh was implanted in Plaintiff, the warnings and instructions provided by J&J and Ethicon for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers and failed to provide adequate warnings and instructions concerning these risks.

80.     At the time the Physiomesh was implanted in Decedent, there were safer feasible alternative designs for hernia mesh products that would have prevented the injuries Plaintiff suffered.

81.     The Physiomesh product costs significantly more than competitive products because of its unique multi-layer coating, even though the multi-layer coating provided no benefit to consumers and increased the risks to patients implanted with these devices.

82.     The Physiomesh implanted in Decedent failed to reasonably perform as intended and necessitated several additional surgeries. Thus, it provided no benefit to Mr. Ingle.

83.     As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Decedent suffered injuries and damages as summarized in this Complaint.

84.     Defendants are strictly liable in tort to Decedent for their wrongful conduct pursuant to the Arkansas Product Liability Act of 1979, Ark. Code Ann. § 16-116-201, et seq.

## COUNT II:
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Ark. Code Ann. § 16-116-201, et seq.)

85.     Plaintiff incorporates by reference the allegations in all prior paragraphs and further alleges as follows:

86.     At the time the Physiomesh was implanted in Decedent Ernest Dale Ingle, the warnings and instructions Defendants J&J and Ethicon provided for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design and/or manufacture against such dangers and failed to provide adequate warnings and instructions concerning these risks.

87.     Defendants expected and intended the Physiomesh product to reach users such as Decedent in the condition in which the product was sold.

88.     Decedent and his physicians were unaware of the defect dangers of Physiomesh, and were unaware of the frequency, severity, and duration of the defects and risks associated with the Physiomesh.

89.     Defendants' Instructions for Use (IFU) provided with the Physiomesh expressly understated and misstated the risks known to be associated specifically with the Physiomesh. The IFUs stated that "Potential adverse reactions are those typically associated with surgically implantable materials." But Physiomesh contains a dangerous and defective multi-layer coating,

which itself causes or increases the risks of numerous complications that are anything but "typical." Those complications include prevention of mesh incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the design of the Physiomesh.

90.     The Physiomesh IFU failed to adequately warn Decedent Ernest Dale Ingle's physicians of numerous risks which J&J and Ethicon knew or should have known were associated with the product. They include the risk of the Physiomesh's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, shrinkage/contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, intestinal obstruction, failure of repair/hernia recurrence, hernia incarceration or strangulation, or rupture of the mesh.

91.     J&J and Ethicon failed to adequately warn Decedent or his physicians about the necessity for invasive surgical intervention in the event of complications. Defendants also failed to train the physicians on how to properly treat such complications when they occurred.

92.     Defendants failed to adequately warn Decedent or his physicians that the necessary surgical removal of the Physiomesh in the event of complications would leave the hernia unrepaired and would necessitate further medical treatment to attempt to repair the same hernia that the failed Physiomesh was intended to treat.

93.     J&J and Ethicon represented to physicians, including Decedent Ernest Dale Ingle's physicians, that the multi-layer coating would prevent or reduce adhesion. They expressly intended for the Physiomesh to be implanted in contact with the intestines and internal organs and marketed and promoted the product for that purpose. But Defendants failed to warn them that the multi-layer

coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device. They further failed to warn physicians that the multi-layer coating was only temporary and therefore at best would provide only a temporary adhesion barrier. Thus, when the coating inevitably degraded, the exposed polypropylene would become adhered to the organs or tissue.

94.     With respect to the complications listed in their warnings, J&J and Ethicon provided no information or warning regarding the frequency, severity, and duration of those complications, although the complications associated with Physiomesh were more frequent and severe, and lasted longer than those with safer feasible alternative hernia repair treatments.

95.     If Decedent or his physicians had been properly warned of the defects and dangers of Physiomesh, and of the frequency, severity and duration of the risks associated with the Physiomesh, Plaintiff would not have consented to allow the Physiomesh to be implanted in his body, and his physicians would not have implanted the Physiomesh in Plaintiff.

96.     As a direct and proximate result of the inadequate and defective warnings and instructions, Decedent Ernest Dale Ingle suffered injuries and damages as summarized in this Complaint.

97.     Defendants are strictly liable in tort to Decedent Ernest Dale Ingle for their wrongful conduct pursuant to the Arkansas Product Liability Act of 1979, Ark. Code Ann. § 16-116-201, et seq.

## COUNT III:
### STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT
### (Ark. Code Ann. § 16-116-201, et seq.)

98.     Plaintiff incorporates by reference the allegations in all prior paragraphs and further alleges as follows:

99.     Defendants designed, developed, manufactured, tested, packaged, advertised, promoted, marketed, distributed, labeled and/or sold the Physiomesh, in a condition which rendered it unreasonably dangerous due to it propensity to result in early failure of the device. Ethicon Multi-Layered Hernia Mesh was unreasonably dangerous in construction or composition.

100.    The Physiomesh contained a manufacturing defect when it left the possession of J&J and Ethicon. The Physiomesh differs from their intended result and/or from other ostensibly identical units of the same product line. Defendants knew or should have known that the Physiomesh could fail early in patients, thereby giving rise to pain and suffering, debilitation and the need for revision surgery to replace the device with the attendant risk of complications and death from such further surgery, Defendants continued to market Physiomesh as a safe and effective absorbable barrier hernia mesh.

101.    The manufacturing defects in the Physiomesh were a producing cause of Decedent Ernest Dale Ingle's injuries and damages specified in this Complaint.

102.    Defendants are strictly liable in tort to Decedent Ernest Dale Ingle for their wrongful conduct pursuant to the Arkansas Product Liability Act of 1979, Ark. Code Ann. § 16-116-201, et seq.

### COUNT IV: WRONGFUL DEATH
### (Ark. Code § 16-62-102)

103.    Plaintiff incorporates by reference the allegations in all prior paragraphs and further allege as follows:

104.    Plaintiff Alwilda Ingle was the lawful spouse of Decedent Ernest Dale Ingle and is the Personal Representative of his estate.

105.    Defendants' tortious acts proximately caused the death of Decedent.

21

106.    Plaintiff and Decedents' other survivors have suffered damages, including loss of financial support, funeral expenses, loss of consortium, and mental anguish.

## COUNT V: PUNITIVE DAMAGES

107.    Plaintiff incorporates by reference the allegations in all prior paragraphs and further alleges as follows:

108.    Defendant J&J and Ethicon failed to adequately test and study the Physiomesh to determine and ensure that the product was safe and effective before releasing it for sale for permanent human implantation; and they continued to manufacture and sell Physiomesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.

109.    Even though Defendants have other hernia repair mesh devices that do not present the same risks as the Physiomesh Flexible Composite Mesh Device, they developed, designed and sold Physiomesh, and continued to do so, because the Physiomesh has a significantly higher profit margin than other hernia repair products. Defendants J&J and Ethicon were aware of the probable consequences of implantation of the dangerous and defective Physiomesh, including the risk of failure and serious injury, such as suffered by Decedent Ernest Dale Ingle. They willfully and recklessly failed to avoid those consequences, and in doing so, acted intentionally, maliciously and recklessly with regard to the safety of those persons who might foreseeably have been harmed by the Physiomesh product, including Decedent Ernest Dale Ingle, justifying the imposition of punitive damages.

## DEMAND FOR TRIAL BY JURY

110.    Plaintiff hereby demands a trial by jury to the full extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alwilda Ingle, Individually and as the Personal Representative of the Estate of Ernest Dale Ingle, prays for judgment against Defendants for compensatory damages and punitive damages and an award of all other remedies available under the law against Defendants Johnson & Johnson and Ethicon, Inc., jointly and severally, including:

    a. special damages, to include past and future medical and incidental expenses, according to proof;

    b. past and future loss of earnings and/or earning capacity, according to proof;

    c. past and future general damages, to include pain and suffering, emotional distress and mental anguish, according to proof;

    d. funeral expenses;

    e. loss of pecuniary support;

    f. pre-judgment and post-judgment interest;

    g. the costs of this action; and

    h. treble and/or punitive damages to Plaintiff;

    i. loss of consortium, society, companionship, and services damages;

    j. damages for survivors' mental suffering and anguish

    k. punitive damages;

    l. interest;

and any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

January 5, 2023

By: /s/ Jason W. Earley
Jason W. Earley, AR Bar No. 2004166
HARE WYNN NEWELL & NEWTON, LLP.
2025 3rd Avenue North, Suite 800
Birmingham, Alabama 35203
Tel: (205) 328-5330

Fax: (205) 324-2165
Jason@hwnn.com
*Attorney for Plaintiff Alwilda Ingle*



CERTIFIED MAIL.

7005 1160 0004 7054 2507

HARE WYNN NEWELL & NEWTON, LLP.
800 Shades Creek Pkwy
Suite 800
Birmingham, AL 35209

US POSTAGE
$ 016.61

JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933-0002

LEGAL